Lucy J. DICKINSON, Plaintiff-Appellant,

v.

BANKERS LIFE & CASUALTY COMPANY, a corporation, Defendant-Respondent.

No. 7428.

Springfield Court of Appeals. Missouri.

Nov. 9, 1955.

C. W. Terry, Camdenton, J. W. Grossen-heider, Lebanon, for appellant.

O. C. Winchell, Lebanon, for respondent.

RUARK, Judge.

In an action for the amount specified in an insurance policy plus damages for vexatious delay and attorney's fees, plaintiff had verdict and judgment totaling $849.12. Thereafter upon defendant's motion the court set this aside and entered judgment for defendant. Plaintiff has appealed.

The evidence from plaintiff's side of the case is that on February 18, 1954, she detached a business reply card from one circularizing prospective customers and mailed it to defendant insurance company's office in Chicago. This card requested complete information about defendant's White Cross plan. On the evening of February 24 following one W. B. White of Springfield called upon plaintiff and her husband at their residence in Lebanon. He informed them he was the "authorized agent" of the

defendant and had with him some papers "with, the company's name on it." He presented the card which plaintiff had mailed to Chicago and proceeded to tell her about the insurance plan. The initial premium required for the type policy in which plaintiff was interested (hospitalization following accident or illness) was $13, which amount plaintiff evidently did not have at the time. She told White she was working at Fort Leonard Wood, that she was paid every two weeks and her next payday would be March 5. White told her that "If you are sure that you want the policy, I will write you out the application tonight and I will send my money to the company and you can pay me and send the money direct to me on that date," and further, "He told me if I took the insurance out, he said it would be—that the company offered, said that the policy would go into effect in less than twenty-four hours after that he had wrote my application." Plaintiff decided to take the insurance and White then proceeded to fill in the blanks on an application for insurance, obtaining the information from plaintiff concerning names of members of the family, ages, previous illnesses, and so forth, as he went along. After the application was completed he signed it and handed it, and his fountain pen, to the plaintiff. Plaintiff testified:

"A. * * * and he was sitting in the chair just by the writing desk and I was sitting right here by the writing desk.

"Q. And you took this application form from him and you had it in your hands, is that right? A. And I signed it and started to read it.

"Q. Well, I mean, you had this in your hands, is that right? A. I had the application he filled out in my hand.

"Q. You picked it up and had it in your hands, it that right? A. He read it to me and I signed it and started to read it.

"Q. You laid the paper down there on the desk right in front of you where you were sitting? A. That's right, and he saw me—

"Q. And did he lend you his pen at that time? A. That's right.

"Q. And with Mr. White's pen and this paper laying in front of you you signed it, is that right? A. I did.

"Q. No one else had hold of it while you did that? A. No, sir, but he reached for it when I started to read it and said, 'It is just what I explained to you, and I have to drive to Springfield tonight,' so I gave it back to him."

In another portion of her testimony plaintiff said she signed the application while it was resting on a book which she held in her lap. She also said that as White left he remarked, "You can feel sure that you will be took care of if you happen to accidents by tomorrow at twelve o'clock." She further testified that she had been planning to go to the M.F.A. and the Blue Cross to find what they had to offer and their rates; that had she not believed she was covered by defendant's insurance she would have secured insurance elsewhere and (presumably) would have been covered on March 1, which is the date of the accident resulting in the hospitalization for which plaintiff claims benefits under the policy. The insurance solicitor, White, testified that he did on the following day turn the application in to the branch office of the defendant at Springfield and paid his own money on the premium, and it is not contended that defendant was guilty of any negligent delay in the issuance of the policy. The application signed by plaintiff was about the size of a sheet from an ordinary school tablet. The printing upon it was larger, more widely spaced and more distinct than the printing in the Southwestern Reporter or the Missouri Reports. It contained a total of nine separate numbered paragraphs each of one sentence, consisting of a question and blank for answer, with the exception of that paragraph which dealt with questions concerning previous illnesses. Paragraph 9 read as follows:

"9. Do you understand and agree that the Policy hereby applied for will

not take effect unless and until it is issued by the Company and duly executed by the President and Secretary of the Company and that the Company is not bound by any knowledge of, or statements made by, or to any agent, unless set forth herein? * * * Yes"

Defendant's witness White denied that he told the plaintiff the policy would go into effect the next day, but stated he told her on the contrary that she would not be covered by insurance until her policy was issued from the home office in Chicago and that the accident coverage would be effective at noon the day of issue; that he explained "date of issue" as meaning the date the application was accepted at the home office and the policy issued. This witness also identified and said the plaintiff signed an exhibit entitled #614B, which is a smaller sheet of paper upon which are printed only three and a half lines of rather large black type which stated:

"I have read the Exceptions in policy form P 85 for which I have currently applied and I understand and agree that accidents incurred before date of issue or illnesses having their inception less than thirty days from date of issue Are Not Insured."

The signatures on the application form and on the last mentioned exhibit are in the same ink and to the uneducated eye appear to be practically identical, but plaintiff denied signing the latter exhibit and so, for the purpose of passing upon the question here before us, we must *assume* she did not sign it.

On the evening of March 1 thereafter plaintiff's son Charles, a member of the family included in the intended coverage, to use his own words, "was filling up the lighter, I spilled the lighter fluid on my britches leg," struck the lighter and ignited not only the lighter but his clothes, from which he suffered serious burns resulting in the necessity of hospitalization, the amount of expenditures for which is not in question here. On March 2 plaintiff's husband forwarded the premium money to agent White at his address in Springfield. On the same day, March 2, the insurance policy was issued. The Springfield office of defendant mailed it to the plaintiff on the 4th day of March, 1954, and it was received by her the following day. Thereafter the plaintiff made claim under such policy, defendant refused to accept liability for hospitalization following the accident which occurred on March 1, and hence this suit.

At the outset the parties do not agree on what the pleadings mean, and we are not sure that we understand them. The petition declares upon what we take to be a contract to insure of date February 25, 1954, noon of the day following the date the application was taken, and, as will be seen from the cases cited hereinafter, this would accord with the treatment given to claims of this character by the majority of decisions in this state, i. e., a claim of a separate, distinct oral contract for insurance. The answer pleaded the application, the written form 614B and the issuance of the policy on March 2, 1954. The reply states that the application was not read by plaintiff, that "defendant induced plaintiff to believe that she was signing a paper which caused the insurance agreement to become binding at noon February 25, 1954, and that defendant thereby induced plaintiff to refrain from obtaining similar insurance from another company"; that defendant was obligated to immediately issue its written policy and that defendant is estopped to deny that the insurance policy between it and plaintiff became effective at noon February 25. Fraud as such is not pleaded and it is not stated how or in what manner plaintiff was induced to believe. No reformation was prayed. We are not able to say from plaintiff's printed argument whether it is contended that the reply is an intended assertion of liability under the policy of insurance as later issued, with estoppel to deny certain of its provisions as to the effective date, and that the construction of the occurrences at the time of the application relate to a later contract (that of the policy of insurance to be issued), as was discussed in Distassio v. American United Life Ins. Co., 238 Mo.

App. 279, 179 S.W.2d 610, loc. cit. 612, 613. But passing by any question of departure (see Banks v. Clover Leaf Casualty Co., 207 Mo.App. 357, 233 S.W. 78, 80), ignoring the question of whether or not plaintiff has attempted to invoke an equitable estoppel to create a liability rather than to preserve a right already in existence, see 45 C.J.S., Insurance, § 674, p. 615; Appleman on Insurance, vol. 16, sec. 9090, p. 629; Berry v. Massachusetts Bonding & Ins. Co., 203 Mo.App. 459, 221 S.W. 748, 751; Mitchell v. American Mutual Ass'n, 226 Mo.App. 696, 46 S.W.2d 231, 236, 237, we will consider the answer and reply as making up a skeleton which directs only the general contours or course of the evidence which we are to consider and about which almost any garment in the form of a cause of action could be draped; and so doing we are of the opinion that the plaintiff failed to make a submissible case on any theory.

■ The defendant insurance company, like any other principal, is responsible only for the acts, representations and agreements of an agent when done or made within the limits of his real or apparent authority. The burden was upon the plaintiff to show that White, the solicitor, had the (real or apparent) authority to make the agreement or representation which plaintiff claims, Williams v. Manning Welding & Engineering Co., Mo.App., 215 S.W. 2d 319; Gosney v. Metropolitan Life Ins. Co., 8 Cir., 114 F.2d 649, 653, and cases cited; and proof of his authority could not be made solely by relating alleged statements made by him, J. R. Watkins Co. v. Lankford, 363 Mo. 1046, 256 S.W.2d 788, 792. There was no showing that White had any authority except to solicit insurance, accept applications therefor, forward them to the defendant and to collect premiums. The courts have repeatedly held, some of them in factual situations much similar to this case, that this is neither real nor apparent authority in the agent to bind the insurer to oral contracts or to change or vary the terms of a written contract of insurance. King v. Mutual Life Ins. Co. of Baltimore, Mo.App., 105 S.W.2d 994; Patterson v. Prudential Ins. Co. of America, Mo.App.,

23 S.W.2d 198; Embree v. German Ins. Co., 62 Mo.App. 132; Rassieur v. Mutual Benefit Life Ins. Co., 356 Mo. 48, 201 S.W. 2d 173; Mitchell v. Metropolitan Life Ins. Co., Mo.App., 116 S.W.2d 186, 188; Byrne v. Farmers Mutual Fire Ins. Co. of Rock Tp., Mo.App., 138 S.W.2d 705; Raker v. Service Life Ins. Co., 226 Mo.App. 1233, 49 S.W.2d 285, 287; Appleman on Insurance, Vol. 16, sec. 9167, pp. 710, 711. The responsibility of defendant was limited to acts done or statements made in the scope of performance of the thing which White was empowered to do. Illustrations and examples of this are: While taking the application advising the proper signature for such, Byrne v. Prudential Ins. Co. of America, Mo.Sup., 88 S.W.2d 344, 348; or in delivering a policy of insurance which is deliverable only while the insured is "in good health," then in determining or waving the health of the insured at such time, Bohannon v. Illinois Bankers' Life Ass'n, 223 Mo.App. 877, 20 S.W.2d 950, 951. Treating the alleged statements of White as being within the category of an explanation of the contents of the policy, and assuming but not deciding such to have been within the general scope of his authority, see Appleman on Insurance, Vol. 16, sec. 9168, pp. 712, 713; Mitchell v. Metropolitan Life Ins. Co., Mo.App., 116 S.W.2d 186, 188, supra, the plaintiff was not entitled to accept as true or rely upon the misexplanation complained of here, because the application which she signed stated exactly to the contrary. This application showed upon its face that it was a request, proposal or offer to take insurance, to be acted upon by the company and upon which, if accepted, a policy of insurance would be issued. Insurance, 29 Am.Jur., sec. 135, p. 151; Mathews v. New York Life Ins. Co., Mo. App., 128 S.W.2d 327; Zielinski v. General American Life Ins. Co., Mo.App., 96 S.W. 2d 1059. It was an offer, while not yet a contract, intended to be relied upon and so become a part of the contract. Previous and contemporary discussions should be presumed to have been merged in this writing. Prestigiacamo v. American Equitable Assur. Co., 240 Mo.App. 839, 221 S.W.2d 217, 221; Smith v. Githens, Mo.App., 271

S.W.2d 374, 378. We realize the foregoing statement, if considered as just a rule of evidence, is somewhat weakened by the pronouncement made by Judge Nortoni in Modern Woodmen of America v. Angle, 127 Mo.App. 94, 104 S.W. 297, 302, wherein he stated that because of the propensity of insurance companies to include many stipulations without regard to their reasonableness, and their desire to invoke the same whether pertinent or not to the real matters contemplated, inherent justice required admission of evidence although in deviation from the rule. See also Haney v. Security Benefit Ass'n of Topeka, 225 Mo.App. 872, 34 S.W.2d 1046, 1053. Nevertheless, the rule that, in the absence of fraud or mistake, one is bound by his written contract (and we think the application as an offer was contractual in nature) is a positive rule of substantive law, "which, when applicable, defines the limits of a contract." Warinner v. Nugent, 362 Mo. 233, 240 S.W. 2d 941, 944, 26 A.L.R.2d 278, and authorities cited; Connor v. Temm, Mo.App., 270 S.W.2d 541. Blood brother to such rule and to the same effect in this case is that, in the absence of fraud, accident or mistake, when an insurance application expressly limits the authority of the agent and the prospective insured signs it, such insured is estopped from relying upon any inconsistent act, statement or representation of the agent. *The insured will be considered to have knowledge of such limitation.* Appleman on Insurance, vol. 16, sec. 9234, p. 775, et seq.; Halbrook v. Atlas Life Ins. Co., Mo.App., 234 S.W.2d 628; Distassio v. American United Life Ins. Co., 238 Mo.App. 279, 179 S.W.2d 610, 613, supra, and cases cited; Muller v. Mutual Benefit Health & Accident Ass'n, 228 Mo. App. 492, 68 S.W.2d 873. And it cannot avail plaintiff to say she did not read it, for one who can read and does not read is foreclosed by his own negligence. The law affords to everyone a reasonable protection against fraud in dealing, but it is not an indulgent guardian which can go to the romantic length of giving protection against the consequences of indolence, folly or careless indifference to the ordinary and accessible means of information. Edmund S. Mills Corp. v. Stinebaker, Mo.App., 67 S.W.2d 821, 822. The facts in this case are similar but not as favorable to plaintiff as those set forth in Halbrook v. Atlas Life Insurance Co., supra, which appellant has attempted to distinguish because of the plea of estoppel in this case. An equitable estoppel presupposes that the person claiming it is one "who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them." Sidney Weber, Inc., v. Interstate Motor Freight System, Mo. App., 205 S.W.2d 291, 297; Charter Oak Inv. Co. v. Felker, Mo.App., 60 S.W.2d 655, 657; Biggs v. Modern Woodmen of America, 336 Mo. 879, 82 S.W.2d 898, 905.

Here the plaintiff had the application in her hand and by her own statement had the opportunity to read. She was literate. There was nothing which was difficult to read or to understand or which was confusing in the writing which she signed. Present was her husband, with whom she could consult. There was no gross inequality between the parties and no claim that the parties stood in any relationship of trust and confidence. To permit an estoppel based simply on the bland statement that the claiming party did not read what she signed would be to announce a principle which would endanger a goodly portion of the nation's entire business structure. It has been said that estoppels are not favorites of the law and are odious. S. S. Allen Grocery Co. v. Bank of Buchanan County, 192 Mo.App. 476, 182 S.W. 777; Foster v. Modern Woodmen of America, 235 Mo. App. 386, 138 S.W.2d 18. We find it so in this instance. It is our conclusion that the action of the trial court in setting aside judgment for the plaintiff and entering judgment for the defendant was correct, and the judgment is affirmed.

McDOWELL, P. J., and STONE, J., concur.